464 So.2d 1272 (1985)
OCALA BREEDER SALES COMPANY, INC., Appellant,
v.
DIVISION OF PARI-MUTUEL WAGERING, DEPARTMENT OF BUSINESS REGULATION, Appellee.
No. AU-422.
District Court of Appeal of Florida, First District.
February 27, 1985.
Daniel Hicks and Paige McMichael Brock of Druck & Hicks, P.A., Ocala, and Timothy B. Elliott of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellant.
William Snow Frates and Raul A. Arencibia of Frates, Bienstock & Sheehe, Miami, amicus curiae, for appellant.
Jim Smith, Atty. Gen., Craig B. Willis, and Kent A. Zaiser, Asst. Attys. Gen., Tallahassee, for appellee.
ZEHMER, Judge.
Ocala Breeder Sales Company, Inc., appeals a final order of the Division of Pari-Mutuel Wagering, Department of Business Regulation, denying its application for a quarter horse pari-mutuel racing permit. We reverse.
On October 7, 1982, Ocala Breeder, an association incorporated under chapter 618, Florida Statutes (1981), submitted an application to the Division, pursuant to section 550.33(1), Florida Statutes (1981), for a permit to conduct quarter horse races. The Division, expressly noting that the application was complete, issued an order denying the application on the basis of an attorney *1273 general opinion[1] which held that an agricultural cooperative marketing association is not empowered under chapter 618 to operate a pari-mutuel horse racing facility. Ocala Breeder petitioned the Division for an informal hearing under section 120.57(2), Florida Statutes (1981), and filed with the Division written argument on the matters in dispute. The Division issued a final order denying the application for a permit, and Ocala Breeder appeals.
Ocala Breeder argues that quarter horse racing would be within its purposes and powers as delineated under section 618.07, Florida Statutes (1981), and that in any event once it was found by the Division that Ocala Breeder had met all the statutory criteria for applying for a racing permit, as required by section 550.02(6) and 550.33(1), Florida Statutes (1981), it was entitled as a matter of law to obtain the permit. The Division counters with the argument that Ocala Breeder, a chapter 618 entity, lacks authority under its enabling statute to possess a quarter horse racing permit and that, as a result, the Division was bound to deny Ocala Breeder's application, notwithstanding its compliance with the permit application statutes.
Section 618.07(1), Florida Statutes (1981), empowers associations such as Ocala Breeder:
To engage in any activity in connection with the producing, marketing, selling, preserving, growing, harvesting, drying, processing, manufacturing, canning, packing, grading, warehousing, storing, handling, or utilizing of agricultural products or in the manufacturing or marketing of the byproducts thereof; or in any activities in connection with the manufacturing, purchasing, hiring or using supplies, machinery or equipment; or in the financing of any of the above-enumerated activities, or in performing business or educational services, on a cooperative basis, for those engaged in agriculture as bona fide producers of agricultural products; or in any one or more of the activities specified herein.
Ocala Breeder contends that the activity of quarter horse racing would result in the "utilization" of quarter horses, admittedly an agricultural product, and would be a vital "marketing and distribution tool" in the breeding and sale of quarter horses. Accordingly, Ocala Breeder contends it is empowered by statute to hold and utilize a quarter horse racing permit.
Ocala Breeder also relies on section 550.02(6), Florida Statutes (1981), which provides:
Upon receipt of [a pari-mutuel racing permit application] and any amendments properly made thereto, the division shall further investigate the matters contained in the application; and if any applicant shall duly fulfill and meet all requirements, conditions and qualifications set forth in this chapter and the rules and regulations of the division hereunder, then the division shall grant the permit to such qualified applicant as hereinabove provided.
It also relies on section 550.33(1), Florida Statutes (1981), which provides, in part:
After receipt of an application, the division shall convene to consider and act upon permits applied for. The division shall disapprove an application if it fails to meet the requirements of this section and this chapter. Upon each application filed and approved, a permit shall be issued setting forth the name of the applicant and a statement showing qualifications of the applicant to conduct racing under this chapter.
Ocala Breeder argues that because the Division admitted that the permit application was complete in all respects it was required by the above statutes to issue the permit.
The Division contends that it cannot grant the permit if Ocala Breeder is not properly authorized to acquire a racing permit. It contends that sections 618.06 and 618.07, unlike legislation authorizing incorporation *1274 and containing broad enabling provisions (e.g., "for any lawful purpose"), carefully enumerate the specific purposes for which a corporation such as Ocala Breeder may be organized. The Division argues that to construe the special purpose statute to allow Ocala Breeder to conduct quarter horse races would be to allow activity too remote from and uncontemplated by the legislature's purpose in enacting chapter 618.
Our review of chapter 618 leads us to conclude that an agricultural cooperative marketing association such as Ocala Breeder is empowered and authorized to hold quarter horse racing permits. Our holding is contrary to the cited opinion of the attorney general, but that opinion is not binding upon the court. 3 Fla.Jur.2d, Interim Topics, Attorney General, § 7.
Section 618.07(10), Florida Statutes (1981), provides that Ocala Breeder has authority:
To do each and everything necessary, suitable or proper for the accomplishment of any one of the purposes, or the attainment of any one or more of the objects herein enumerated, or conducive to or expedient for the interest or benefit of the association, and to contract accordingly; and in addition, to exercise and possess all powers, rights, and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged, and any other rights, powers, and privileges granted by the laws of this state to corporations for profit, except such as are inconsistent with the express provisions of this chapter; and to do any such thing anywhere.
The expansive language of this subsection evidences a legislative intent to grant agricultural cooperative marketing associations such as appellant broad powers necessary to accomplish their stated objectives. It expressly grants powers as broad as those possessed by corporations for profit. Quarter horse racing is obviously "suitable or proper for the accomplishment of ... the purposes" of breeding and marketing quarter horses. The holding of quarter horse races is manifestly "conducive to or expedient for the interest or benefit of the association" in carrying out its objectives and purposes. We hold that the foregoing subsection, construed with subsection 618.07(1), quoted above at page 1273, empowers Ocala Breeder to operate a pari-mutuel quarter horse racing facility. We find nothing in sections 618.06 or 618.07 or any other provision in chapter 618 that specifically prohibits Ocala Breeder from receiving the racing permit for which it applied to the Division. Since the application was conceded by the Division to be otherwise complete on its face, the Division was in error in refusing to issue the permit. Gulfstream Park Racing Assn., Inc. v. Division of Pari-Mutuel Wagering, Dept. of Business Regulation, 407 So.2d 263 (Fla. 3d DCA 1981).
In 1984 the legislature amended section 550.33, Florida Statutes, governing quarter horse racing, to specifically permit agricultural cooperative marketing associations to apply for quarter horse racing permits and operate such races under a validly issued permit. A long existing rule of statutory construction is that "[t]he mere [statutory] change of language does not necessarily indicate an intent to change the law for the intent may be to clarify what was doubtful and to safeguard against misapprehension as to existing law." State ex rel. Szabo Food Services, Inc. of N.C. v. Dickinson, 286 So.2d 529, 531 (Fla. 1974). We conclude that the amendatory language simply clarified the legislative intent by explicitly setting forth certain powers of agricultural cooperative marketing associations which had previously been generally described.
The Division's final order denying the racing permit to Ocala Breeder is reversed, and this case is remanded with instructions that the Division issue such permit.
REVERSED and REMANDED.
ERVIN, C.J., and BOOTH, J., concur.
NOTES
[1] Letter dated April 7, 1983, from Attorney General Jim Smith to the Honorable Carl Ogden, Chairman, Committee on Regulated Industries and Licensing, Florida House of Representatives (R. 10).