543 So.2d 824 (1989)
CITY OF NEW SMYRNA BEACH, Appellant/Cross-Appellee,
v.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND, State of Florida, Appellee/Cross-Appellant.
No. 88-604.
District Court of Appeal of Florida, Fifth District.
May 11, 1989.
*825 S. LaRue Williams of Kinsey Vincent Pyle, P.A., Daytona Beach, for appellant/cross-appellee.
Lee R. Rohe, Asst. Atty. Gen., and Margaret S. Karniewicz, Asst. Gen. Counsel, Tallahassee, for appellee/cross-appellant.
DANIEL, Judge.
This is an appeal by the City of New Smyrna Beach (City) and a cross appeal by the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida (State) from a final judgment ruling on the validity and use of a beach toll imposed by the City. We affirm in part, reverse in part and remand for further proceedings.
In March 1985, the State filed suit against the City for declaratory judgment and injunctive relief. The State alleged that it was the owner and trustee of all lands within the City which lie east of the mean high water mark of the Atlantic Ocean, that the State holds in trust for the public the right to use lands within the City which lie west of the mean high water mark to the line of natural vegetation for recreation and public roads and that the City has improperly placed toll booths at most ramps providing access to the beach within the City and requires a fee for each vehicle operating on the beach.[1] The State requested a determination that the City has no right or authority to restrict access to these lands and sought a permanent injunction enjoining the City from enforcing its ordinances relating to the beach toll.
*826 The City answered the complaint and raised several affirmative defenses. The City pointed out that the State had never expended any funds or managed the beach, that the City has been charging a beach toll since 1968 without objection by the State, and that the State had failed to participate in a previous action involving the constitutionality of the beach toll ordinances. The City also counterclaimed seeking to recover the funds it had expended for maintenance of the lands for which the State now claims ownership or trusteeship.
During the pendency of this case, the Legislature enacted Chapter 85-55, Laws of Florida, popularly known as the "Growth Management Bill". Section 36 of Chapter 85-55 created the Coastal Zone Protection Act of 1985. The provision designated as section 161.58(2) prohibited vehicular traffic on the beach unless authorized by local authorities and provided for the charging of a toll and the expenditure of toll revenue for "beach maintenance." The parties stipulated to a continuance while the City passed new ordinances enacted with reference to section 161.58. The Legislature later amended this section to allow for beach toll revenue to be used for certain "beach related expenditures" in addition to "beach maintenance." The State amended its complaint to charge that the City has collected more beach toll revenue than is required for beach maintenance, that the City has used the beach toll revenue for activities in nonbeach areas, and that the City's seasonal tolls (tolls were collected only from the first Tuesday in March through Labor Day) are discriminatory. The State later filed its second and third amended complaints which essentially contained the same allegations.
At trial[2] the State called six witnesses, all City employees. The Assistant Planner for the City testified that according to 1980 statistics, the population of the City in the area lying west of the Indian River was 7,348 and the population east of the river was 8,798, of which thirty percent were tourists. The Supervisor of the Sanitation Division testified that it takes a three-man crew three to four hours a day to clean the beach in the off-season and a full day in the beach toll season. The Public Works Director testified that there were five full-time and four temporary employees employed during the 1985 beach season and that the employees who worked on the beach also worked elsewhere in the City but that their time cards reflect where the work was performed.
A City patrolman testified that the City has four all terrain vehicles for patrolling the soft sand which are not used for routine patrol. The patrolman admitted, however, that there had been occasions when the all terrain vehicles were taken off the soft sand for other duties such as traffic control. The patrolman testified further that the beachside areas are divided into zones with the "sand" zones referring to the sandy beach and the "beach" zones referring to the hardtop roads east of the Indian River and up to the sand. The officers designated their work time as either "sand" or "beach" but they did not specify on their time entries the exact time they worked. Another police officer testified to a tremendous increase in weekend traffic and police calls during the toll season.
The police records custodian testified that police officers' pay was charged to various City funds based on information from their individual time cards. The custodian could not isolate all the hours spent on beach law enforcement and beach related traffic management because of the officers' varying degrees of diligence in filling out their time cards but felt that the records were fairly accurate. She noted, however, that all patrols listed as either "sand" patrols or "beach" patrols were charged to the beach toll funds.
The City's Finance Director testified that the beach toll season ran from the first Tuesday in March through Labor Day, that the City charged $1.00 per vehicle on weekdays *827 and $2.00 per vehicle on weekends, that the City charged an even dollar amount to avoid making change, and that the City charged $2.00 on the weekends because the weekends were busier. The Finance Director acknowledged that section 161.58 had been amended in 1986 but admitted that the City made no adjustments in accounting after the law changed and used the same accounting methods to allocate expenses to the beach toll fund.
The Finance Director further testified that some expenses, such as the salaries for toll collectors, were directly charged to the beach toll fund while other expenses, such as overhead, were charged to the beach toll fund on an allocation basis. For example, the City allocated beach ramp toll salaries for 1985 as direct charges to the beach toll fund. The City also allocated 14.57 percent of the public safety budget to the fund. The 14.57 percent was derived by dividing the beach ramp toll salaries by the adjusted public safety (police department) salaries. The Finance Director admitted that there were no time logs of patrol vehicles on the sand or on the beachside and that beach toll money was being used to deliver services to the beachside rather than to the sandy beach itself. The Finance Director also stated that some officers working on beach traffic would not show that time on their time cards and that it would be an undue burden on the officers to require that they keep minute by minute time records.
The City's auditor testified that the beach toll fund was established in 1984 and that it is a special revenue fund, that is, its expenditures and revenue are earmarked for specific purposes. In 1985, the City spent $964,598 for beach related expenses with $619,000 coming from the beach toll fund. In 1986, the City spent a total of $1,096,273 for beach related expenses but only $606,270 came from the fund.[3]
The City's Police Chief testified that more officers were needed in the summer for beach activity, especially on weekends. During this testimony, the trial judge took judicial notice of the fact that in the beach toll season, the beach count increased, crime increased, the number of arrests and citations increased, and the police chief had to call officers in on overtime duty.
In its final judgment the trial court concluded that beach toll collection and expenditures were authorized by the City's home rule powers between March of 1968 and October 1985, that the City had violated the 1985 version of section 161.58 by its expenditure of beach toll revenue between October 1, 1985, and July 1, 1986 for purposes other than beach maintenance, and that the City had violated the 1986 version of section 161.58 by expending beach toll revenue for purposes other than beach maintenance and the beach related categories set out in the statute. The court further concluded that the City's $1.00 toll is unreasonable and excessive and that the toll of $2.00, applied on weekends and holidays, is unjustified, unreasonable and discriminatory. In accordance with these determinations, the court denied relief to the State regarding revenue prior to October 1985 and denied the City's counterclaim for reimbursement of those expenses. The court also ordered the City to repay to the beach toll special fund the amount of $305,832 for its past violations of section 161.58.
Both parties have challenged the final judgment. On appeal, the City contends that the trial court erred in interpreting the 1985 and 1986 versions of section 161.58 and in holding that some of the City's expenditures were not permitted under the statute, arguing that the City always had the right, under its home rule powers, to impose reasonable user fees for access to the beach and to use that revenue for the maintenance, operation and improvement of the beach. The City also argues that the trial court erred in finding that the City's one dollar weekday beach toll was unreasonable and excessive and that the two dollar beach toll, applied on the weekends *828 and holidays, was unjustified, unreasonable and discriminates between "outsiders" and residents.[4] On cross appeal, the State argues that the City had no authority to impose a toll prior to October 1985, the effective date of section 161.58, and accordingly all of the toll money should be returned to the public. These three claims are related and will be discussed below.[5]
Under our 1968 Constitution and the Municipal Home Rule Powers Act, cities in Florida have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for "municipal purposes" except as otherwise provided by law. Art. VIII, § 2(b), Fla. Const.; Ch. 166, Fla. Stat. (1987). The term "municipal purpose" is not a restrictive term and is defined as any activity or power which may be exercised by the state or its political subdivisions. § 166.021(2), Fla. Stat. (1987). See also Ormond Beach v. County of Volusia, 535 So.2d 302 (Fla. 5th DCA 1988). Section 166.021(3) specifically provides that:
The Legislature recognizes that pursuant to the grant of power set forth in s. 2(b), Art. VIII of the State Constitution, the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act, except:
* * * * * *
(b) Any subject expressly prohibited by the constitution;
(c) Any subject expressly preempted to state or county government by the constitution or by general law ...
* * * * * *
Section 166.201 expressly authorizes a municipality to charge user fees:
Taxes and charges.  A municipality may raise, by taxation and licenses authorized by the constitution or general law, or by user charges or fees authorized by ordinance, amounts of money which are necessary for the conduct of municipal government and may enforce their receipt and collection in the manner prescribed by ordinance not inconsistent with law.
In City of Daytona Beach Shores v. State, 483 So.2d 405 (Fla. 1985), the Florida Supreme Court reviewed two cases involving the validity of user fees charged to drivers of motor vehicles for entry onto the beach. There the state had contended that local governmental entities have no constitutional or statutory authority to regulate motor vehicle access to the beaches or to charge a motor vehicle access fee. In its opinion, the supreme court noted that the Legislature had addressed that issue by enacting 161.58. In view of this legislation, the court found it unnecessary to address the authority of local governmental entities to impose such fees under other legislative acts and constitutional provisions. The court, however, did find that:
the public trust doctrine, which declares that Florida's beach sovereignty lands must be accessible to the public, does not prohibit local governments from imposing reasonable user fees for motor vehicle beach access, so long as the revenue is expended solely for the protection and welfare of the public using that particular beach, as well as for improvements that will enhance the public's use of the sovereign property.
483 So.2d at 408.
Since there is no constitutional prohibition against the City imposing reasonable user fees for access to the beach provided that the revenue received is used solely for the maintenance, operation and improvement of the beach and the Legislature did not act in this area until 1985 when it passed the Coastal Zone Protection Act, we conclude that the City, under its home rule powers, had the authority to impose a reasonable fee for the use of the beach within its municipal boundaries from 1968 *829 until October 1, 1985, the effective date of the Act.
The Coastal Zone Protection Act, as its name implies, was enacted to control growth in our sensitive coastal areas. Section 161.58 originally provided for the regulation of vehicular traffic on coastal beaches as follows:
(2) Vehicular traffic, except that which is necessary for cleanup, repair, or public safety, or for the purpose of maintaining existing authorized public access ways, is prohibited on coastal beaches. Notwithstanding the provisions of this subsection, the local government with jurisdiction over a coastal beach or part of a coastal beach, by a three-fifths vote of its governing body, may authorize vehicular traffic on all or portions of the beaches under its jurisdiction. Any such local government shall be authorized by a three-fifths vote of its governing body to charge a reasonable fee for vehicular traffic access. The revenue from any such fees shall be used only for beach maintenance purposes. ... (emphasis added)
This section was later amended, effective July 1, 1986, to provide that the revenue from the beach toll
shall be used only for beach maintenance; beach-related traffic management and parking; beach-related law enforcement and liability insurance; or beach-related sanitation, lifeguards, or other staff purposes.
The cardinal rule of statutory construction is that a statute should be construed so as to ascertain and give effect to the legislative intent expressed in the statute. State v. Webb, 398 So.2d 820 (Fla. 1981); Philip Crosby Associates v. State Board of Independent Colleges, 506 So.2d 490 (Fla. 5th DCA 1987). When a statute is in need of interpretation or construction, the courts should avoid giving it an interpretation that will lead to an absurd result or render the statute purposeless. Id. Another rule of statutory construction is that the mere change of statutory language does not necessarily indicate an intent to change the law for the intent may be to clarify what was doubtful and to safeguard against misapprehension as to existing law. See State ex rel. Szabo Food Services, Inc. v. Dickinson, 286 So.2d 529 (Fla. 1973); Keyes Investors Series 20, Ltd. v. Department of State, 487 So.2d 59 (Fla. 1st DCA 1986); Ocala Breeder Sales Company v. Division of Pari-Mutuel Wagering, 464 So.2d 1272 (Fla. 1st DCA 1985).
The original Act authorized the collection of a beach toll and expenditures for "beach maintenance". Surely the Legislature must have recognized that the mix of cars and reclining persons on a beach is a lethal mixture[6] which results in traffic accidents and parking problems and affects liability insurance premiums. If the term "beach maintenance" were to be construed as limited solely to physical upkeep of the beach, then the municipalities would have to shoulder the economic burden of the increased costs for law enforcement, life guards, emergency services and liability insurance. There is nothing in the Act to indicate that this outcome was intended. Moreover, the quick response in amending section 161.58 suggests that the Legislature recognized that the term "beach maintenance" could be construed in a limited manner and so more definitive legislation was enacted clearly setting forth specific categories of beach related expenditures.
We therefore conclude that the 1986 amendment to section 161.58 was enacted to simply clarify the existing authority by explicitly setting forth specific categories of permissible expenditures from the beach toll revenue fund. Thus under both the 1985 and 1986 revisions, beach toll revenue could be used for beach maintenance as well as for traffic management, parking, law enforcement, liability insurance, sanitation, lifeguards and other staff purposes, so long as such expenses were beach related. Thus the trial court erred in limiting toll expenditures prior to July 1, 1986, to physical upkeep of the beach and in disallowing beach related expenditures. The court also erred in limiting expenditures to *830 the toll season. No such limitation appears in the statute. The beach requires maintenance and other services all year long and the City is entitled to collect a toll for only part of the year for services needed year round. See Stone v. Town of Mexico Beach, 348 So.2d 40 (Fla. 1st DCA 1977).
We also disagree with the trial court's conclusion that the toll season is arbitrary. City officials testified to their belief that it would cost more to collect the toll in the off-season than the amount of revenue generated. This belief does not appear unreasonable. We further conclude that it is reasonable for the City to have a surplus as long as the funds remain in the beach toll fund and are used for the purposes set out in section 161.58. See Contractors & Builders Association of Pinellas County v. City of Dunedin, 329 So.2d 314 (Fla. 1976).
The determination to impose a $1.00 toll on weekdays and a $2.00 toll on weekends was a legislative function properly exercised by the requisite 3/5 majority of the City's governing body. The burden to show that such disparate charges were unreasonable under the circumstances here was with the challenging party. Such burden was not met by the evidence adduced and, accordingly, the trial court's determination that differing tolls rose to the level of "unreasonableness" was error.
In conclusion, we reverse the portion of the final judgment determining that the toll was unreasonable and that the City had expended beach toll revenue in violation of section 161.58. In all other respects, the judgment is affirmed.
On remand, the trial court should review the expenditures of beach toll revenue by the City, keeping in mind the purpose of section 161.58. We agree with the trial court that the term "maintenance" means the process of upkeep and preservation and that the Legislature intended, under this category, for beach toll revenue to be used to keep the beach in a state of repair. We do not believe, however, that expenses for beach maintenance must be limited to acts done directly on the sandy beach itself. The trial court also construed the modifier "beach related" too narrowly and thus erred in limiting expenditures for law enforcement to access ramps and the sandy beach, in disallowing fringe benefits and allocation of overhead, in allowing only the direct costs attributable to the risk associated with the beach for purposes of liability insurance, in limiting traffic management to expenditures for managing traffic directly on the beach, in allowing only direct expenses for sanitation, and in concluding that "other staff purposes" involved only the toll collectors. On remand, the trial court should be guided by the standard set forth in McGovern v. Lee County, 346 So.2d 58 (Fla. 1977).
In McGovern v. Lee County, the Florida Supreme Court reviewed a revenue bond proposal which would require the users of a bridge which had already paid for itself to now be used for substantial improvements to several roads, one of which is over twelve miles from the bridge. Under the applicable legislation, bridge improvement bonds may be issued to pay for the costs of improving roads only if they are "approaches" or "approach roads" to the bridge and causeway. The legislation, however, did not provide a definition of "approaches" or "approach roads". In construing these terms, the Florida Supreme Court adopted the following standard:
Inherent in the legislative scheme for funding self-liquidating projects is the principle that those who directly benefit from the project should bear a substantial portion of the cost and that those who bear the substantial costs should benefit from the expenditure of money on the project. To allow bridge tolls to finance improvements of approaches and approach roads to the bridge does not violate this principle, for those paying the tolls will benefit by having access to the bridge made more convenient. We conclude that in determining if a road is an approach to a bridge it is necessary to ask about the road's function, not its location. Essential to this finding is the factor that the amount of traffic the road feeds to the bridge determines whether a road functions as an approach to the bridge. A road or a segment of a road is an approach or approach road if a significant portion of its traffic moves onto the *831 bridge or causeway, or if a significant portion of the traffic moving across the bridge or causeway came from the road or road segment.
346 So.2d at 64-65.
The bond proposal would also require that users of the bridge pay for the construction of recreational facilities. The Florida Supreme Court held that the proponents of the bond proposal would have to demonstrate a sufficient and direct relationship between the use of the toll bridge and the recreational facilities. In short, the court concluded:
No island resident or visitor should be required to pay for mainland road improvements or island recreational facilities unless the projects confer a substantial benefit to the users of the bridge or unless a significant portion of the bridge traffic will come from such improvements.
346 So.2d at 66.
We conclude with the observation that had the Legislature intended for beach toll revenue to be used solely on the beach itself, it would have simply said so.
AFFIRMED in part; REVERSED in part and REMANDED.
SHARP, C.J., and DAUKSCH, J., concur.
NOTES
[1] See Art. X, § 11, Fla. Const; §§ 253.001, 253.04(1), Fla. Stat. (1987).
[2] Prior to trial, the parties stipulated to certain facts regarding the amount of the toll, the amount of the revenue collected by the City, and the expenditures which were changed against the beach toll fund for the years 1985 and 1986.
[3] Before the beach ramp toll fund was established, the toll money was placed in the City's general fund. When the fund was created in 1984, a surplus of $310,446 was transferred to it from the general fund. When expenditures for the beach exceeded revenue in 1985 and 1986, surplus funds and general funds were used to pay those expenses.
[4] The State concedes that its equal protection challenge was stricken by the trial court and accordingly we express no opinion on any equal protection claim.
[5] We find no merit to the remaining issues raised by the City on appeal.
[6] See Ralph v. City of Daytona Beach, 471 So.2d 1 (Fla. 1983).