Louis V. Jackvony, *Atty. Gen. ex rel. vs.* Robert J. H. Powel *et al.*

JULY 22, 1941.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J.    This matter is before us on a certification by the superior court, under general laws 1938, chapter 545, § 6, as amended by public laws 1940, chapter 941, sec. 2, of the question of the constitutionality of public laws 1940, chapter 848.

This question arose upon the record in a suit in equity that was begun by a bill of complaint filed by the attorney general of this state, in behalf of Herbert E. Macauley and other citizens thereof, against the three members composing the Easton's Beach Commission of the city of Newport. The substantial relief prayed for in this bill was that the respondents and their servants and agents be permanently enjoined from erecting or causing to be erected a fence or other barrier on the shore between the high and low, water lines and lying to the south of the property known as Easton's Beach, situated in and belonging to the city of Newport.

Later an amended bill of complaint was filed by the complainant and an answer thereto was filed by the respondents, in which they admitted the allegations of some of the paragraphs of this bill and denied, entirely or with certain qualifications, the allegations of its other paragraphs. From the admitted allegations the following facts appear to be established for the purposes of this cause.

The city of Newport is the owner of a certain parcel of land known as Easton's Beach, located in that city and bounded southerly by land which is owned by the State of Rhode Island and which constitutes a part of the shore of the Atlantic Ocean from the line of mean high tide on the

north to the line of mean low tide on the south. The respondents were duly appointed as the members of the above-named commission by the representative council of the city of Newport in accordance with public laws 1939, chapter 759, with authority "to rebuild, construct and operate Easton's Beach."

While the amending act now in question was pending in the general assembly, the respondents, as such commission, publicly stated in writing their intention not only to fence Easton's Beach, above the high water line, but also, if authorized by the passage of this amending act, to construct and maintain a wire fence, six feet in height, which would follow the extension southerly of the line separating the city of Newport and the town of Middletown and would extend from the line of mean high tide to the line of mean low tide, and to construct and maintain a similar fence at or near the western end of the beach and extending to the line of mean low tide. They also publicly stated that their reason for constructing such fences is "To keep non-residents from using the beach for nothing and thus protect Newport taxpayers."

The amending act now in question was duly enacted by the general assembly and was approved by the governor of this state on April 22, 1940. It amended sec. 2 of the former act by inserting directly after the first sentence, which simply stated the title of the commission, the following sentences: "Except as otherwise directed by the representative council, said commission shall have control and charge of said beach, *including the shores thereof between high and low water marks,* and shall operate and manage said beach and all the buildings and facilities thereon. Said beach is hereby defined as that tract of land bounded on the west by the Cliffs, so-called, on the north by Bath Road, on the east by the boundary line between the City of Newport and the Town of Middletown, and on the south by the Atlantic Ocean."

By this part of the amending act, if valid, and especially by the language above italicized by us, the commission was given control and charge of the shore, as above defined, to the south of Easton's Beach and was directed to "operate" that shore, as well as the beach itself.

The following further provisions are contained in the amending act. It is provided that the commission shall deliver to the city treasurer of Newport the net income received from the operation of the beach in renting lockers, bathhouses, concessions, rights and privileges, and from all sources connected therewith. It is then provided that the commission "may charge suitable and reasonable fees for admission to any part of said beach, provided, however, that it may exempt residents of said city from the payment of admission fees and registration fees to the beach only."

It is next provided that it shall charge reasonable and suitable fees for admission to and the use of bathhouses, swimming pools, etc., "to the end that the operation of said beach will be self-liquidating and *reasonably profitable,* considering its investment and the expenses of operation incidental to the same." (italics ours)

All these further provisions were in the original act; but on account of the language, above quoted from the amending act, by which the definition of "Easton's Beach" was enlarged so as to make it include the shore to the south of the beach proper, they were made to apply, for the first time, to this shore. Therefore, if the amending act be valid, they would have the effect of authorizing the commission to charge fees from the people of the state for admission to such shore and for the use of facilities provided by the commission on such shore and, by so doing, to make a larger profit for the city.

By the amending act the following provision was also added to the original act: "Said commission may erect fences on any part of the shore on said beach between high and low water marks." Immediately following this is a provision which varies only slightly from one in the original

act, and which states that the commission "shall have power to make such reasonable rules and regulations *as it may deem necessary and proper* for the care, management, operation, maintenance, protection and improvement of any part of said beach and of any buildings, fences, . . . and other property which may be thereon, from time to time . . . ." (italics ours) This provision also, if the amending act be valid, would apply to the shore to the south of the beach as well as to the beach itself.

It is true that the respondents, in their answer, deny the allegations of the seventh paragraph of the amended bill, wherein it is stated that the proposed fence "will obstruct, interfere with, and prevent the passage of the relator and all other citizens of the state of Rhode Island along the shore between high and low water marks." Nevertheless, it is evident, from other allegations in the amended bill which are admitted in the answer to be true, that the respondents intended, by the erection and maintenance of fences across the shore if authorized by law, to prevent any inhabitants of the state who are not residents of the city of Newport from passing along the shore proper into that portion thereof which lies in front of Easton's Beach, as properly defined, unless their reason for entering that portion of the shore is for the exercise of fishing or seaweed removal rights.

But whatever the intention of the respondents may be, it is clear that, if the amending act be valid, they may be given, by the city of Newport, the power to prevent any of the people of the state from passing along the shore into that part of it which is to the south of Easton's Beach. All these matters should be taken into consideration by us in determining whether or not the amending act is valid.

It is admitted that sec. 17 of article I of the constitution of this state, ratified in 1843, is as follows: "The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have heretofore been entitled under the charter and usages of this

state. But no new right is intended to be granted, nor any existing right impaired, by this declaration."

It is asserted in the bill, and denied in the answer, that, by reason of the above-quoted provisions which chap. 848 of the public laws purports to add, by amendment, to sec. 2 of chap. 759 of the public laws, this chapter 848 is null and void as being in violation of the above-quoted provision of our state constitution. On motion by the respondents, this question of constitutionality, thus raised upon the record in this cause, was, by a decree of the superior court, certified to this court for determination, being the question now before us, as above stated.

The above provision of the constitution does not define what, at the time of the adoption of the constitution, were "the privileges of the shore" to which the people of the state had been theretofore entitled. But it seems clear to us that there must have been some such "privileges", which were then recognized as belonging to the people and which the framers and adopters of the constitution intended to change into "rights", beyond the power of the general assembly to destroy.

Among the common-law rights of the public in the shore, which have been frequently claimed by the public or have been described by authors who have discussed the law pertaining to rights in the shore, are rights of fishing from the shore, taking seaweed and drift-stuff therefrom, going therefrom into the sea for bathing, and also, as necessary for the enjoyment of any of these rights, and perhaps as a separate and independent right, that of passing along the shore. From time to time it has been asserted by members of the public that these are rights coming within the description of "privileges of the shore" to which the people of this state, at the time of the adoption of its constitution, had theretofore "been entitled under the charter and usages of this state"; and that therefore their continuance is guaranteed by the above-quoted section of the constitution.

But we have found no decision by the supreme court of this state, nor has there come to our attention any decision by any court of Rhode Island while it was a colony, in which it was decided what these privileges were.

There are, however, some opinions by this court, dealing with the rights of the people and the powers of the general assembly as to shell fisheries which throw some light on the problem now before us in this cause. The case of *State* v. *Cozzens*, 2 R. I. 561 (1850), involved the question of the constitutionality of an act of the general assembly "for the preservation of oysters and other shell fish within this State", which provided at what time of the year oysters or clams could be taken from common fisheries and in what quantities and in what manner. It also provided for the appointment of commissioners with power to lease land covered by public waters for private oyster grounds or fisheries, if they were convinced, by personal inspection, that any ground so leased could be used more to the public advantage as a private bed under lease than as a public bed.

This court decided that this act was valid, saying, at page 564, with reference to the sections of the act which so provided: "We understand the object of these sections is not the benefit of the lessees of the private bed, but, by holding out motives to them to plant and cultivate oysters, to secure to the public a more abundant supply. In other words, the constitutional right is so regulated as to reserve to the public the greatest benefit."

This language was a recognition of the fact that the constitution protected certain rights of the people as to shell fisheries and was quoted with apparent approval by this court in its opinion in *Payne & Butler* v. *Providence Gas Co.*, 31 R. I. 295 (1910), at 319, in which it also quoted, with apparent approval, the following statement in its opinion in *State* v. *Medbury*, 3 R. I. 138 (1855), at 143, with reference to the same section of the constitution: "This section of the Constitution leaves the rights of fishery and

privilege of the shore, where they were. It neither diminishes or adds to them . . . ."

In the opinion in the *Payne & Butler* case this court also pointed out that in at least two instances, which were fully set forth and which occurred in 1822 and 1827, long before the adoption of our constitution, the general assembly granted to certain persons exclusive rights, upon certain terms and under certain conditions, to establish, maintain and operate oyster beds in particular, defined locations. This court therefore held that the above section of the constitution did not take away from the general assembly the power which it had previously exercised over the subject of fisheries; but that the whole subject of fisheries and of all kinds of shell fish situated within the domain of this state is under the fostering care of the general assembly. We see no reason for disagreeing with that conclusion, which has been followed and applied in later cases.

But we have not found, nor has there been called to our attention, any instance in which the general assembly, before the adoption of the constitution, legislated with regard to the privileges of the people of this state in its shores bordering on tidewaters and lying between the lines of mean high tide and mean low tide, privileges which have been commonly believed to include the above-mentioned privileges of fishing from the shore, taking seaweed and driftstuff therefrom, going therefrom into the sea for bathing, and of passage along the shore.

In deciding the question certified to us in the instant cause, we need to concern ourselves only with the right of passage along the shore; and in that connection it is interesting to note the language of this court in several cases. In *Clark* v. *Peckham,* 10 R. I. 35, at page 38, this court said: "That, while the shore itself, and the space between high and low-water mark is public for passage, the riparian owner has a right of access to the great highway of nations, of which he cannot be deprived, is recognized by a great number of cases."

*Potter, J.,* said in his concurring opinion in *Providence Steam-Engine Co.* v. *Providence & Stonington Steamboat Co.,* 12 R. I. 348, at 357: "The true doctrine seems to be, as a result of the decisions, that the State has the governmental control of the shores and tide-waters for the benefit of the public, in order to protect the public rights of passage or other rights on the shore, and to protect the navigation." This was only a *dictum,* but there was nothing inconsistent with it in the opinion of the court. It was held in that case that a riparian owner has certain rights in the shore in front of his property, subject to control by the state, including a right of wharfing out.

In *Allen* v. *Allen,* 19 R. I. 114, at 115, this court said, by way of *dictum*: "The State holds the legal fee of all lands below high water mark as at common law, as has been uniformly and repeatedly decided by this court." On page 116, the court continued thus: "This right of the State is held, however, by virtue of its sovereignty, and in trust for all the inhabitants, not as a private proprietor. The public rights secured by this trust are the rights of passage, of navigation and of fishery, and these rights extend, even in Massachusetts, to all land below high water mark unless it has been so used, built upon or occupied, as to prevent the passage of boats, and the natural ebb and flow of the tide. . . . Until actual filling out, the public rights exist as before."

In *Rhode Island Motor Co.* v. *City of Providence,* 55 A. 696 (1903), very nearly all of the language above quoted from *Allen* v. *Allen, supra,* is set forth, by way of *dicta,* with evident approval.

Counsel for the respondents in the instant cause assert, in effect, that when the expressions "public for passage" and "rights of passage" are used in the above-cited cases, they refer to rights of owners of the upland just above the line of mean high tide to cross the shore to the tidewater, rather than to the right of the people to go along the shore. But we do not find that assertion to be correct.

It is true that the statements above quoted, from opinions of this court, as to a public right of passage along the shore between high-water mark and low-water mark are only *dicta*. But in the absence of any decision by this court determining just what rights, if any, of passage along the shore are protected by the above-quoted provision of the Rhode Island constitution, we are of the opinion that the above *dicta* are entitled to much consideration, especially as they seem to have been acquiesced in ever since they were stated.

After considering the above authorities in this state and all other authorities here and elsewhere which have been called to our attention or which we have found and which have any bearing on the constitutional question now before us, we are of the opinion that at the time of the adoption of our constitution there was, among the "privileges of the shore", to which the people of this state had been theretofore entitled under the "usages of this State", a public right of passage along the shore, at least for certain proper purposes and subject, very possibly, to *reasonable* regulation by acts of the general assembly in the interests of the people of the state. Whether this right is thus subject to such regulation we need not and do not decide.

If the amending act now in question be held constitutional, the resulting amended act would authorize the commission to construct any kind of a fence which it chose to construct, of any height, which might be without any gates and by the use of which the commission could prevent any person or persons from passing along any part of the shore between Easton's Beach and the line of mean low tide, within the lateral limits specified in the act, for any purpose whatever, be it for fishing, bathing, boating, getting seaweed or sand, or for exercise or any other purpose.

The commission, as above set forth, has stated publicly what sort of fences it intends to have constructed and for what purpose it intends to use them, and that it intends to make arrangements so that persons may be allowed to pass

through such fences for the exercise of rights to fish or to remove seaweed from the shore. But its intentions in these matters have, in our judgment, no bearing on the question of the constitutionality of the amending act, which does not purport to limit it in any of these respects.

It is also true, as above stated, that in that act, immediately after the provision purporting to give the commission the right and power to erect fences on any part of this shore, as bounded in the act, there is a provision purporting to endow the commission with the power to make such reasonable rules and regulations as it may deem necessary and proper for the care, management and operation of any fences which may be thereon from time to time. But we cannot see how this provision purporting to grant to the commission a certain discretionary power as to fences, which power it may or may not exercise, can prevent the act from being held void for unconstitutionality.

The question to be decided by us in this matter is that of the constitutionality of the act now before us, which, if valid, would, by adding by amendment certain language to P. L. 1939, chap. 759, give the respondent commission, without any restriction whatever, the power to erect fences of any sort on any part of the shore, i. e., the land between high and low water marks and lying between the cliffs, so-called, on the west, and the extension southerly of the boundary line between the city of Newport and the town of Middletown, on the east, and thereby to exclude the public from that part of the shore, or to admit them only on such conditions as the commission may wish to impose; and to control, operate and manage that part of the shore as if it belonged to the city of Newport as a part of Easton's beach; and by so doing to make a profit solely for that city.

After taking all these matters into consideration, we are forced to the conclusion that the general assembly is without power under the constitution to vest in the commission such broad, unrestricted and unregulated authority, as the act in question purports to vest therein.

The decision of this court is that public laws 1940, chap. 848, is unconstitutional and void because it is in violation of article I, section 17 of the constitution of this state.

The papers in the cause with the decision of this court certified thereon are ordered sent back to the superior court for further proceedings.

*Louis J. Barry, Jr.*, for complainant.

*Jeremiah A. Sullivan*, City Solicitor, for respondents.