DECISION
James Cavanaugh and several other private citizens have brought this action on behalf of themselves and the class described as "everyone who wishes free access to the sea and shore in question ("Plaintiffs") against named defendants the Town of Narragansett ("Town"), the State of Rhode Island ("State") and the Coastal Resources Management Council ("CRMC") alleging that the Town's actions restricting access to the Narragansett Town Beach ("Beach") to those people who pay a beach access fee, violates the Plaintiffs' state and federal constitutional rights.[1] Additionally, the Plaintiffs argue that, even if the Town can charge a fee for access to the beach, the current fee was improperly instituted, constitutionally invalid, and beyond the Town's authority. Similarly, Plaintiffs allege that the State's and CRMC's failure to prevent the Town from restricting access to the Beach, and to create alternative public rights-of-way to the Beach violates Plaintiffs' rights. After a nonjury trial, this Court finds that Plaintiffs do not have a fundamental constitutional right to sue the dry sand beach in question without cost, and that the current fee has been properly enacted and structured.
 Factual Background and Procedural History
At the mouth of Narragansett Bay's western shore, in the Town of Narragansett, is a stretch of sandy coastline beach which is approximately one-mile long. The beach runs to the south from Narrow River and ends at a curved stone wall which has been constructed on the beach's southern tip. To the east, this stretch of beach is bordered by the Atlantic Ocean, and on the western landward side, the beach abuts Ocean Road. The Beach's parking lots and bathhouse pavilions lie directly over the western most edge of the beach where it meets Ocean Road. (See Narragansett Tax Assessor's Plat maps A, B, and C.) It is also undisputed that the northern tip of this beach is privately owned and used as a members only club known as the Dunes Club. The remainder of the sandy beach area, covering approximately 437,300 square feet, is owned by the Town of Narragansett.
In September of 1938, this stretch of beach was devastated by what has become known as the "great hurricane." Zaroogian v. Townof Narragansett, 701 F. Supp. 302 (D. R.I. 1988); Dancliff RealtyCorp. v. Miller, 101 R.I. 478, 481, 225 A.2d 52 (1966). In response to the extensive nature of the damage and upon a request by the Narragansett Town Council, the Rhode Island Legislature passed P.L. 1939, Ch. 764, § 1. Zaroogian, 701 F. Supp. 302
(D. R.I. 1988). This measure was later approved by the Town's electors at a financial meeting held on March 17, 1939. Id.
Pursuant to the authority granted to the Town in P.L. 1939, Ch. 764, the Town acquired the then-privately-held beach parcels known as "Palmers," "Sherry's," and "Clambake Blub" beaches, consolidated them into the single municipal beach described above, and constructed a pavilion on the site. Zaroogian, 701 F. Supp. 302 (D. R.I. 1988); Dancliff, 101 R.I. at 481, 225 A.2d at 54 (1966). Then, in 1954, disaster struck again and the pavilion was destroyed by Hurricane Carol. Id.
In order to rebuild the destroyed facilities, the Town issued bonds. After the new multi-building pavilion was constructed, the Beach Commission, as established by P.L. 1939, Ch. 764, continued to operate the Beach and charge beach admission fees. This Commission was later abolished by the adoption of the Narragansett Home Rule Charter in 1967. After the adoption of this Home Rule Charter, however, the Beach did not cease to operate and the Town continued to charge beach entrance fees. From 1966 to the present day the Director of the Narragansett Department of Parks and Recreation has maintained and operated the beach facilities and continued to charge members of the public seeking access to the Beach. The beach access fee schedule for the 1996 season was as follows:
Beach Access Fee Resident Non-resident
(per person)
daily: under 11 years no charge no charge
daily: over 12 years $4.00 (four dollars) $4.00 (four dollars)
season: under 12 no charge no charge
season: under 12-17 years $5.00 (five dollars) $10.00 (ten dollars)
 old
season 18-61 years old $12.00 (twelve dollars) $24.00 (twenty four
 dollars)
season 62 older $6.00 (six dollars) $12.00 (twelve
 dollars)

The monies collected through these fees were used to recoup the costs incurred by the Town in operating the beach and its facilities. The fees provided a source of funds to pay for lifeguards, fire, police and rescue services, sanitary facilities, trash disposal and beach cleaning. Stipulated Fact 21.2. Regardless of these fees, however, the evidence of record indicates that the Beach as a whole operates at a loss. Affidavit of Maurice J. Lootjens, Narragansett Town Manager.
As of today, the Beach, its facilities and fences along with the Dunes Club, Narrow River and the sea wall — all combine so as to deprive access from the landward side (perpendicular access) to the Beach and the stretch of shore abutting it unless one pays either an entrance or a membership fee. For example, Plaintiff James Cavanaugh had attempted to cross the dry sand area of the Beach in order to access the shoreline below the sand without paying the mandatory beach fee. As a result, he was charged by the Town with the misdemeanor of failure to pay the beach admission fee. The Plaintiffs then filed this action in 1991 seeking to prohibit the Town from blocking perpendicular access from the landward side to the section of shore below the Beach.
Specifically, Plaintiffs argue that Art. I, § 17 of the Rhode Island Constitution and various other state and federal constitutional and statutory provisions provide the people with the right to "free access" to the shore, and that the Town's beach access fee violates this right. Additionally, Plaintiffs assert that the manner by which defendant has established and structured the beach access fees also violates Plaintiffs equal protection and due process rights in that the fees are discriminatory. Originally Plaintiffs also asserted claims against the State and CRMC based on allegations that these entities had breached their duty to provide free access to the shore.
On September 16, 1996, this Court denied Plaintiffs' first motion for summary judgment and dismissed the State and CRMC from the action based on a finding that they were under no duty to provide access to that stretch of shore. The Court further found that even if they should provide such access, the exercise of those powers was of a discretionary nature and, as a result, this Court would not order the State or CRMC to exercise those powers in a specific manner. The Court noted that this was especially true in light of the fact that Plaintiff had never attempted to initiate CRMC actions prior to filing the suit. The Plaintiffs then filed a series of motions to reconsider this Court's decision, along with several new motions which included a second motion to amend the complaint and a second motion for summary judgment. By written decision, this Court denied all of Plaintiffs' motions, except that Plaintiffs were allowed to amend their complaint. This second amended complaint attempted to bring the State back into the action based on allegations that the State owned the sea wall which affirmatively served to block access to the shore. The record contains no evidence that this complaint was ever served upon the State. As a result, this claim against the State is not properly before the Court and will not be addressed because the State is no longer a party to the present action, having been removed from this action in September of 1996.[2]
This matter was heard by the Court sitting without a jury on certain evidentiary issues and at the conclusion of that hearing the Court asked the parties to submit final memoranda addressing the legal and factual issues in dispute. After a review of the evidence, the parties' respective memoranda and historical documents, together with further independent legal research, including minutes of the 1986 Constitutional Convention, this matter is now ready for decision.
 Plaintiffs' Rights to Use the Beach Free of Financial Charge
The Court starts with the proposition that it is the Plaintiffs who must establish that a right of access to and along the shore exists and that this right has been deprived. First and foremost, Plaintiffs rely upon Art. I, § 17 of the Rhode Island Constitution to establish that they not only have a right of access along the water's edge of shore but also have a right to free, unobstructed access to that shore from the landward side (hereinafter perpendicular access). Plaintiffs allege that this right of perpendicular access is created by the language of Art. I, § 17 and the intent of the Constitutional Framers. Alternatively, Plaintiffs assert that this right of perpendicular access is created out of necessity so as to provide meaningful substance to the right of access along the shore.
To determine whether or not such a right exists pursuant to Art. I, § 17, this Court must adhere to and rely on the well-established principles of statutory construction which our Supreme Court has adopted. In construing the Constitution, this Court's purpose is to effectuate the intent of the Constitution's Framers. Bailey v. Baronian, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978). See also Cardarelli v. Department of Employment andTraining, 674 A.2d 398 (R.I. 1996) (finding that this same purpose applies when determining the meaning of a statute). Thus, where the terms and express language of a statute are clear and unambiguous, then those words must be given their plain and obvious meaning. Gelch v. State Board of Elections,482 A.2d 1204, 1223 (R.I. 1984); see also In Re Advisory Opinion to theGovernor, 504 A.2d 456, 459 (R.I. 1986). For in such a situation, the plain and ordinary meaning of the statute is "presumed to be the one intended by the Legislature [or Framers], and the statute is "presumed to be the one intended by the Legislature [or Framers], and the statute must be applied literally." Gelch, 482 A.2d at 1222; In Re Advisory Opinion, 504 A.2d at 459 (R.I. 1986) (citing Exeter-West Greenwich Regional School District v.Pontarelli, 460 A.2d 934, 936 (R.I. 1983)).
In interpreting Art. I, § 17 to divine the intent of the Framers, several other tenets of statutory construction should also be considered. The Court must examine the entire Constitution, as a whole, and its individual sections must be viewed in the context of the entire document. See Sorenson v.Colibri, 650 A.2d 125 (R.I. 1994). This is true in part because the meaning of the words in the statute can become clear by reference to other words in the statute. Howard Union of Teachersv. State, 478 A.2d 563 (R.I. 1984). Every word, sentence or provision in a statute is presumed to have some useful purpose, some force or effect. Gross v. State Division of Taxation,659 A.2d 670 (R.I. 1995). In determining the Constitution's meaning the Court may not attribute to the Framers the intent to enact provisions that lead to absurd or unreasonable results. State v.McDonald, 602 A.2d 923 (R.I. 1992).
Where the language's meaning is unclear the Court must also look to the history of the disputed provision, "for a page of history is worth a volume of logic in determining the extent of state as well as federal constitutional limitations." In ReAdvisory Opinion, 688 A.2d at 291 (1997). When the language has been previously amended, the Court must be cognizant of the fact that it is generally true that when a provision is amended, the drafters should be assumed to have "intended to accomplish some purpose thereby." Such purpose might be the clarification of the language or the alteration of the original enactment. HometownProperties, Inc. v. Fleming, 680 A.2d 56, 62 (R.I. 1996). If still no clear indication of the Framers' intent can be established, and no prior decision exists, then the Court may look to other jurisdictions. Bailey, 120 R.I. at 394.
 Art. I, § 17 of the Rhode Island Constitution provides that
 "[t]he people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore; and they shall be secure in their rights to use and enjoyment of the natural resources of the state with due regard for the preservation of their values; and it shall be the duty of the general assembly to provide for the conservation [of] . . . and to adopt all means necessary and proper by law to protect the natural environment of the people of the state." (Emphasis added.)
Additionally, Art. I, § 16 provides further protection for governmental actions geared toward protecting Rhode Island's waters and their shores. Specifically this section provides that
 "[t]he powers of the state and of its municipalities to regulate and control the use of land and water in furtherance of the preservation, regeneration, and restoration of the natural environment, and in furtherance of the protection of the rights of the people to enjoy and freely exercise the rights of fishery and the privileges of the shore, as those rights and duties are set forth in Section 17, shall be an exercise of the police powers of the state, shall be liberally construed, and shall not be deemed to be a public use of private property."
It is clear and undeniable, based on the express language of these provisions, that a right of access along the shore exists to some extent. The plain and ordinary meaning of "along" is "lengthwise of, implying motion . . . distinguished from across . . . . The term does not necessarily mean touching all points." Black's Law Dictionary, 77 (6th Ed. 1990); see also
Webster's New Universal Unabridged Dictionary (2nd Ed. 1983) at 51. What is unclear, however, is whether this right is absolute given the provision's contradictory language providing that the people must be allowed to freely exercise the privileges of the shore, but that the right to use and enjoy the shore must be exercised in such a manner as to preserve that right. Additionally, this provision places upon the General Assembly the duty to provide for the conservation of the shore and to "adopt all means necessary and proper by law to protect the natural environment of the people of the state." See also R.I. Const. Art. I, § 16 (providing that the government's power to take such actions shall be liberally construed). It would seem logically inconsistent to charge the government with the duty to preserve the shore and all the powers necessary to achieve this goal but not allow them to place some restrictions on the people whose use of the shore places it in jeopardy.
Similarly, the provision by its own language provides absolutely no indication that a right of perpendicular access across the property of others exists. Compare Texas Open Beaches Act Tex. Nat. Res. Code Ann. § 61.011 (West 1978) (stating that "it is declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state owned beaches"). Not only does the express language of our Constitution not grant such a right, it seemingly contradicts the implication of such a right. The plain and ordinary meaning of "along" is distinguished and is different from "across." Black's Law Dictionary, 77 (6th Ed. 1990). Given this ambiguity and in order to determine to what extent access to the shore as opposed to along it exists, the Court must look to the intent of the Constitution's Framers, the structure of the Constitution as a whole, the history of the provision, and more generally, the law of other jurisdictions.
Prior to the 1986 Rhode Island Constitutional Convention, Art. I, § 17 stated only that
 "[t]he people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, and they shall be secure in their rights to use and enjoyment of the natural resources of the state with due regard for the preservation of their values; and it shall be the duty of the general assembly to provide for the conservation [of] . . . and to adopt all means necessary and proper by law to protect the natural environment of the people of the state."
In 1986 the most relevant language enumerating specific rights of the shore including "the right of passage along the shore" was added. The original more general language, however, was not viewed as being more restrictive than the 1986 provision. Rather this language, which derived from old English law through the Charter of King Charles II, granted on July 8, 1663, and which created the Colony of Rhode Island and Providence Plantations, merely left undefined and unenumerated the rights of the people. This Charter stated that
 "our express will and pleasure is, and we do, by these presents, for us, our heirs and successors, ordain and appoint that these presents, shall not, in any manner, hinder any of our loving subjects, whatsoever, from using and exercising the trade of fishing upon the coast, in any of the seas thereunto adjoining, or any arms of the seas, or salt water, rivers and creeks, and where they have been accustomed to fish; and to build and set upon the wasteland belonging to the said Colony and Plantations, such wharves, stages and workhouses as shall be necessary."
Rhode Island Constitution Annotated Art. I, § 178 at 9. Seealso Committee on the Executive Branch and Independent Agencies Committee Report on Convention Resolution 86-00003. Thus with the passage of Art. I, § 17 in the original 1842 Rhode Island Constitution, the State of Rhode Island adopted and incorporated the "public trust doctrine" from England. The purpose of the changes made in 1986 was not to alter the original 1842 language but merely to further define those preexisting rights, so as to guard against possible future Rhode Island Supreme Court decisions which might erode away or diminish, through definition, the "people's rights." Proceedings of the Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 5-6. More specifically, the convention delegates and Committee members responsible for the change sought to protect the Rhode Island Supreme Court's decision of Jackvony v. Powell, 67 R.I. 218
(1941), which attempted to define those preexisting rights from future reversal. In Jackvony, the Rhode Island Supreme Court held that Easton's Beach Commission of the City of Newport could not erect or cause to be erected a fence or other barrier on the shore between the high and low water lines south of Easton's Beach and only allow people to pass through that barrier who had paid a fee, because to do so would prevent the citizens of the state from exercising their right of "passing along the shore."
Thus, in order for Plaintiffs to have any right to use or cross the Beach under Art. I, § 17 they must establish either that 1) the sandy beach area in question is "the shore" referred to in Art. I, § 17; 2) the Framers of the Constitution intended to provide perpendicular access across private lands to the shore incident to the express right to pass along the shore; or 3) prior to this provision, the people had a public trust doctrine right or some other legal right to pass over dry sand area to reach the shore.
Plaintiffs' first argument, that the shore includes the width of the dry sand beach to the street, is legally and factually unsupported. Rhode Island has consistently followed the United States Supreme Court decisions of Shively v. Bowlby, 152 U.S. 1, 26, 14 S.Ct. 548, 38 L.Ed 331 (1894) and Phillips Petroleum v.Mississippi, 484 U.S. 469, 479 (1988) and defined the shore as being bounded on the landward side at the mean high tidemark as established over a period of 18.6 years. Hall v. Nascimento,594 A.2d 874, 876 (1991), Northeastern Corp. v. Zoning Board ofReview, 534 A.2d 603, 606 (1987), State v. Ibbison, 448 A.2d 728
(1982). At the 1986 Convention the delegates of the Committee on the Executive Branch and Independent Agencies specifically rejected a provision that would alter this definition opting to continue to define the shore in a manner that would neither expand nor diminish prior rights. Compare passage of Resolution 86-0004 with Resolution 86-0069. While this Court has not been provided with sufficient facts or information to establish geographically exactly where this line is, it is clear that it does not encompass the entirety of the dry sand beach, or at any point from the water to Ocean Road. See Narragansett Tax Assessor's Plat Maps A, B, and C, and Deposition of Joseph Cavanaugh dated July 1, 1997, at 42. In fact the only point at which the Court could conceivably find the mean high tide mark on the shore abutting the road is at the sea wall, but as discussed earlier, Plaintiffs have failed to take the necessary steps to prove ownership of the wall and to bring that party before the Court. As such, there is no stretch of shore as contemplated by the convention and defined by Rhode Island law which provides the Plaintiffs access from Ocean Road to the shore where the Beach abuts the Atlantic Ocean.
The second argument propounded by the Plaintiffs is that the Framers intended "along the shore" to include across to the shore. This is also unsubstantiated. The record before the Court is devoid of substantial evidence to support Plaintiffs' assertion that the Framers of the Convention specifically intended to include perpendicular access across lands to the shore along with the expressly granted access along the shore. While the Court is more than cognizant of plaintiff Joseph Cavanaugh's role at the Constitutional Convention and his service as a member of the Committee on the Executive Branch and Independent Agencies, this does not mean that what Plaintiffs now assert Art. I, § 17 means is in fact what the entire Committee and Convention members intended it to mean, and it is that collaborative intent and meaning that controls. Rather, Cavanaugh's opinion that Art. I, § 17 provides access across lands to the shore (deposition of Joseph Cavanaugh dated July 1, 1997, at 41-46) must be read together with the records of that convention as they pertain to Art. I, §§ 16 and 17.
After examining the original convention resolution which ultimately led to the additional language, the Committee Report and Findings on this resolution and the agendas, minutes, and written testimony that led to those reports and findings, it is the ruling of this Court that the Framers' intent in changing Art. I, § 17 was not to provide any new rights of perpendicular access across property to the shore where such rights did not already legally exist. See Committee on the Executive and Independent Agencies Report on Convention Resolution 86-00003 (which clearly delineates between preexisting public rights and private landowner rights and concludes that public rights cannot be expanded to include dry sand areas where they do not already exist by prescription or dedication because to do so would operate as a taking). See also Committee on the Executive and Independent Agencies Proposed Findings Convention Resolution 86-00003 (limiting public use of private lands abutting the shore to those rights acquired such as dedication and stating that the "constitution imposes a duty on state and local government as well as on the courts to protect and preservetraditional access routes to the shore). (Emphasis added.) For example, at the March 12, 1986 public hearing held on the proposed additions to Art. I, § 17, Committee Member Sisson, who sponsored the resolution altering Art. I, § 17, clearly states that the resolution would "incorporate the privilege in the Constitution, thus frustrating anymore attempts to fence offlateral access akibg [sic(along)][3] the shores of RhodeIsland." Proceedings of the Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 6. (Emphasis added.)
Additionally, testimony was read into the record by a sponsor of an alternative resolution to the one eventually passed that was identical with the resolution passed except for the inclusion of a definition of shore. Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 10. Delegate David M. Chmeilewski recognized that perpendicular access to the shore was not before the Committee when he stated that "provisions of public access walkways leading from the street to the public shoreline would greatly expand the use of the public portion of the beach. That particular problem is currently under study by the State Coastal Resources Management Counsel and can be dealt with administratively or by General Assembly acts." Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 10-11. Not only were these general statements made, but when one of the speakers at the hearing, a Mr. Carvalho, specifically noted that "the Town of Narragansett charges anyone entrance to the beach, which I think has always been in violation of that law," he was requested to "just stick to the constitutional issues" by Committee Chairwoman Lila Sapinsley. Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 93-94. In addition, Mr. Nixon, who testified before the Committee, addressed an observation made by Convention President McKenna by stating that "my article doesn't seem to make much sense to give rights along the shore if you don't give access to the shore . . . however, that's the law, it was there, remains the law today . . . we are addressing it in a fairly hard hitting way with the Coastal Resources Management Council, attempting to find more access points, in general. The right to trespass across someone's property doesn't exist historically." Committee on Executive Branch Agencies dated March 12, 1986, at 83. Lastly, Senator Sasso commented at the hearing regarding the Sisson resolution that "we, indeed, have to preserve and protect our shore line and our access to it, and I believe that the resolutions that Mr. Sisson . . . has introduced will be very helpful in this area." Committee on Executive Branch and Independent Agencies dated March 12, 1986 at 102. See also
Committee on Executive Branch and Independent Agencies dated March 12, 1986, at 19 (where Mr. Robert Randall discussed being harassed when he attempted to use present rights-of-way to pass to the shore), at 34 (where Mr. Esposito points out that Jackvony
did not address dry sand issues), at 43 (where Mr. Varin speaks in support of the Sisson resolution because it does not establish new rights but further defines long-established and well-recognized rights), at 54 (where Mr. Donovan testifies about the obstruction and destruction of recognized and established rights-of-way leading to the shore), at 89 (where Convention President McKenna questioned where the people in Mount Pleasant could go when they wanted to get a tan, and Mr. Prentiss, who was testifying at the hearing, responded "the local tanning salon"). Given this information, the record supports a finding that the Constitutional Convention members were more than aware of the fact that in some circumstances they were creating a right that could not be vindicated or exercised by the Constitution alone but rather required state legislative action to also take place so as to create legally enforceable access points.
Plaintiffs' third and only remaining argument is to establish that a right of legal perpendicular access across the dry sand beach in question under Art. I, § 17 exists because that right of access existed prior to the Constitution's adoption. One such legal mechanism for recognizing a preexisting right is the public trust doctrine because Art. I, § 17 represents Rhode Island's most recent codification of the ancient doctrine known as the "public trust doctrine." New England Naturist Associationv. Larsen, 692 F. Supp. 75, 78 (D. R.I 1988). This doctrine in turn traces its roots back to the Journal of Gaius, a second century codification of the natural law of the Greek Philosophers. David C. Slade, Putting the Public Trust Doctrineto Work (1990). Some four centuries later, the doctrine was again restated in the Institutes of Justinian. Id. It was the Institutes of Justinian which contained the oft quoted statement "by the law of nature these things are common to all mankind — the air, running water, the sea and consequently the shore of the sea. No one, therefore is forbidden to approach the seashore provided that he respects habitations, monuments and buildings." This public right was then transplanted into the English common law through the Magna Carta, and from the English common law it was incorporated into the laws of the thirteen original colonies after the American Revolution. Michelle Ruberto and Kathleen A. Ryan, The Public Trust Doctrine and Legislative Regulation inRhode Island: A Legal Framework Providing Greater Access toCoastal Resources in the Ocean State, 24 Suffolk U.L. Rev. 353. This incorporation was based, in part, by the fact that the colonies took their title derivatively from the King, who was subject to the doctrine. Id.
In general, the public trust doctrine established that title to tidal and navigable waters, and the lands beneath these waters, is vested in the State for the benefit of the public. David C. Slade, Putting the Public Trust Doctrine to Work (1990).See also Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548 (1894). As a result of their "beneficiary" status, the people have the right to use and enjoy these resources for a variety of public uses. David C. Slade, Putting the Public Trust Doctrine to Work (1990). Each individual state, however, has the power to define what lands are encompassed within the doctrine and what rights the doctrine protects and preserves. Shively v. Bowlby, 152 U.S. at 26, 14 S.Ct. at 557 (1894) and Phillips Petroleum v. Mississippi,484 U.S. 469, 479, 98 L.Ed.2d 877, 887, 108 S.Ct. 791, 796 (1988). Thus, while some states include the dry sand beaches which abut the shores, others do not. Compare Slocum v. Boaroughof Belmar, 238 N.J. Super. 179, 569 A.2d 312 (N.J. Super. 1989)with Opinion of the Justice, 139 N.H. 82, 649 A.2d 604 (1994). While most states recognize that the doctrine protects recreational uses, other states have held the doctrine only to be applicable in the context of commerce and navigation. David C. Slade, Putting the Public Trust Doctrine to Work. Lastly, while generally the doctrine does not provide rights of perpendicular access across non-trust lands to reach trust lands, some states have broadened the trust's protections so as to provide reasonable perpendicular access across non-trust property to access trust lands. Rhode Island law has traditionally defined the boundaries of the shore for purposes of the public trust doctrine as the mean high tide mark and recognized points of access thereto. Allen v. Allen, 19 R.I. 114 (1895). this rule still remains. New England Naturist, 692 F. Supp. 75 (D. R.I. 1988). Consequently, unless the dry sand beach is a recognized public access, it does not fall within the public trust doctrine relating to the shore as described in Art. I, § 17. Rhode Island does, however, recognize that included within the rights provided to the people by the public trust doctrine are recreational rights such as swimming and strolling along the shore. R.I. Const. Art. I, § 17. The question then becomes whether the rights included within Art. I, § 17 necessarily imply a right to use the lands beyond trust lands. It does not appear, however, as discussed above, that the intent of the conventioneers and committee members was to address the issue of newly created perpendicular access points beyond merely recognizing that such access points should be investigated and developed by the State.
To conclude the analysis under Art. I, § 17, the Court needs to determine whether a specific right-of-way has been developed at the Beach through dedication, prescription, or custom. Such a right-of-way would independently create a right of access across the Beach that would then, in turn, be recognizable under Art. I, § 17 to protect and preserve traditional rights-of-way.
A dedication is the transfer of an interest in land from an owner to the public or to a public body. 20 Am.Jur.2d Conveyancesand Titles § 11.6 at 800. In Rhode Island, for a dedication to be effective, two things must occur. First, the grantor must have intended to offer the land interest to the public. "Whether a landowner has made an offer to dedicate his property to the public is purely a question of determining from the facts of the particular case the owner's intent." Robidoux v. Pelletier,120 R.I. 425, 391 A.2d 1150 (1978). "It is essential to a valid dedication that there be a manifested intent by the owner to dedicate the land in question for the use of the public. The existence of such an intent to dedicate will not be lightly presumed." Vallone v. Cranston, 97 R.I. 248, 197 A.2d 310, 314 (1964). This intent is to be determined by the grantor's acts and declarations. An intended offer of dedication is termed an incipient dedication. Robidoux, 120 R.I. 425, 391 A.2d 1150.
Second, dedication requires that the offer be accepted by either means of public use or official action. Gammons v.Caswell, 447 A.2d 361, 366 (R.I. 1982). Plaintiffs bear the burden of proving this acceptance by clear and convincing evidence, Vallone, 97 R.I. at 252, 197 A.2d at 314, and any acceptance must take the form of some sort of overt act. Senn v.MacDougall, 639 A.2d 494 (R.I. 1994).
The record, as it stands, contains no evidence to support a finding that the Town intended to dedicate the property in question to the public's use in a free, absolute, and unrestricted manner. Rather, given the language that accompanies the enabling act, it was assumed and provided from the beginning that the Town would charge a fee for use of its beach property.See P.L. 1939, Ch. 764. See also Report of the Beach Committee.
Alternatively, prescription allows a person to establish a right of use of another's property where that person demonstrates by a preponderance of clear and convincing evidence that he or she enjoyed uninterrupted, quiet, peaceful use of the property in question for ten or more years, and that this possession was actual, open, notorious, hostile, under claim of right, continuous and exclusive. Compare Palisades Sales Corp. v. Walsh,459 A.2d 933 (R.I. 1983) with Gammons v. Caswell, 447 A.2d at 366 (R.I. 1982), Walsh v. Cappuccio, 602 A.2d 927 (R.I. 1992). A plaintiff's mere sporadic use is insufficient. See, G.L. 1956 § 34-7-1. Where use of property is permissive, an easement by prescription cannot be claimed. Altieri v. Dolan, 423 A.2d 482
(R.I. 1980). While there is undisputed evidence of record that the Town beach has been used by the members of the public for more than one hundred years, the evidence also tends to show that this use was made of the property with the permission of the Town contingent upon payment of a fee and by the private property owners who held title to the property prior to the Town. Additionally, it appears that other prior private owners operated their facilities for profit. Letter dated November 2, 1939, John B. Carpenter to the Narragansett Town Council. Even if Plaintiffs were to prove the requisite elements of adverse possession, private parties cannot adversely possess property owned by the State or municipality when used by the public. See Hall v.Nascimento, 594 A.2d 874, 877 (R.I. 1991). As such, any claims of prescription must fail as a matter of law.
Lastly, the law of custom might create a public right to use beach property which predated Art. I, § 17 and therefore would be recognized and subsumed into the rights protected by this provision. The law of custom generally dictates that a custom or usage practiced so long that the memory of man runneth not to the contrary and what is locally, continuously, peaceably, and certainly observed becomes binding on those constituents of the local community. David J. Bederman, The Curious Resurrectionof Custom: Beach Access and Judicial Taking, 96 Colum. L. Rev. 1375 (1996). See also Stevens v. City of Cannon Beach, 317 Or. 131, 854 P.2d 449 (1993). As with the prescription arguments, however, the necessary element of "so long as the memory of man runneth" cannot be satisfied in the instant case given the more recent history of the beach and its previous private owners' operations.
As a result, the record does not support a finding that Art. I, § 17 creates a right of passage over the Beach to reach the shore, but rather that this provision was adopted by the members of the Convention with knowledge of the fact that access to the shore necessary to exercise the enumerated rights was, in some circumstances, nonexistent.
It is worthy of note that, even if this Court were to have found a right of perpendicular access under the guise of the public trust doctrine, dedication, prescription or custom, this still would not mean that the Town could not attach a "reasonable" fee to exercising of that right. State of Wisconsinv. Linn, 205 Wis.2d 241, 556 N.W.2d 394, (Wis. App. 1996) (discussing public trust land boat launches and noting the allowance of a "reasonable fee" for use of those sites); City ofNew Smyrna Beach v. Board of Trustees, 543 So.2d 824 (Fla. Dist. 1989) (upholding beach access fee for vehicles accessing public trust beach lands); Gewirtz v. City of Long Beach, 69 Misc.2d 763, 330 N.Y.S.2d 495 (1972) (finding a public right of access to a beach front park by dedication but noting the allowability of a limited reasonable fee for maintenance); Borough of Neptune Cityv. Borough of Avon-by-the-Sea, 61 N.J. 296, 294 A.2d 47 (N.J. 1972) (finding that municipalities may validly charge a reasonable fee for public use of public trust beach lands). Seegenerally McQuillin Mun Corp. S 24.207 (3rd Ed.) (stating that "[s]wimming beaches . . . and similar establishments may be subject to municipal regulation . . . Any regulation adopted by a municipality to regulate the use of public beaches must be reasonable. An ordinance regulating public bathing beaches and providing for payment of a fee . . . is a valid exercise of the police power for the public safety and general welfare.") Such regulations and fees have also been imposed where legislation included language providing free access to the shores. See Texas Open Beaches Act.
In Jackvony the Court left open the question of whether this right may be subjected to reasonable regulation. 67 R.I. at 227. Like Jackvony, the new language added to Art. I, § 17 in 1986 merely provides the people with the right to "passage along the shaw." The new language in Art. I, § 16 and § 17, did, however, answer the question of regulation remaining open inJackvony, with a resounding "yes." Not only was reasonable regulation continued to be permitted by the new Art. 1, § 17, but it was required, where necessary, to maintain and preserve the shore. The powers to regulate the shores were strengthened via the amendment of Art. I, § 16.[4]
The Plaintiffs also assert that the beach access fee is invalid because it violates the Fourteenth Amendment of the United States Constitution and Art. I, § 2 of the Rhode Island Constitution by infringing upon Plaintiffs' fundamental rights. More specifically, Plaintiffs assert that not only is "free access to the shore" a natural and fundamental right in itself, but it is also a fundamental right because it implicates the rights of freedom of association, interstate travel, and property.
As discussed above, the right to access beaches so as to access the shore is not a fundamental state right. Similarly, access across property is not a fundamental federal right. Rather such recreational rights are non-fundamental and may be subject to regulation so long as the regulations rationally promote their purposes. Zaroogian, 701 F. Supp. at 305 (holding that by its very nature, use of beach facilities is a recreational activity and not entitled to heightened scrutiny). If, however, the regulation effects other fundamental rights, then it may achieve fundamental right status derivatively.
While Plaintiffs may be right in their assertion that "the shoreline in question has for over a century been a tremendously popular public recreational meeting place" this Court is not persuaded that it necessarily follows that free access to that shore is a fundamental right derived from the right of association. Such an assertion is directly contrary to prior holdings in other state and federal courts. New England Naturist,692 F. Supp. 75 (D. R.I. 1988) (holding that "[t]he case law on this subject has uniformly rejected arguments that nude sunbathing on a public beach is Constitutionally protected either as a mode of expression, as a form of association, or as a privacy right"). (Citations omitted.)
Additionally, the access fee does not violate any of Plaintiffs' constitutional rights to travel. Assuming Plaintiffs have standing to assert such a claim, the claim must fail for, while the right to travel throughout the United States is a well-recognized and basic constitutional right, the evidence of record fails to support a finding of an interference with that right. A state law implicates the right to travel only "when it actually deters travel," when impeding travel is intended, or when a classification contained in the law serves to punish those who do travel. Attorney General of New York v. Soto-Lopez,476 U.S. 898, 902, 106 S.Ct. 2317, 2320-2321, 90 L.Ed.2d 899, 904 (1986). Most right to travel cases fall within the second and third categories. Id. n.3. Plaintiffs, on the other hand, based their allegation of unconstitutionality upon the fact that people cannot leave the shore and enter the navigable waters so as to travel from the beach without paying a fee. Plaintiffs' Memo at 32. Thus Plaintiffs assert that the beach access falls within the first category of violate actions. The record contains no evidence, however, to support this conclusion. Merely because people cannot leave from the shore at that single point, without paying a fee, does not mean that the right to travel is implicated. The record is totally devoid of any evidence to support the allegation that Plaintiffs wished to travel interstate but were unable to do so because of the Town fee. Similarly, no concrete evidence exists supporting the proposition that the fee has interfered with the rights of others to travel. This Court will not assume such an interference simply based upon the existence of the fee.
Lastly, Plaintiffs assert that the beach access fee deprives the people of Rhode Island of their fundamental constitutional right to property. The property right Plaintiffs assert is being denied to them is the same right enumerated in Art. I, § 17 as discussed above. However, and as previously discussed, the Framers of Rhode Island's Constitution were more than aware that they were creating a right that could not be exercised on every inch of Rhode Island's shores and, as a result, only intended the right to be exercised where ways of access existed or were later legally created by affirmative state action. Thus, as to the specific section of shore in question, no right has been infringed upon because no right existed.
Similarly given the inherent limitations upon the right being recognized, and the fact that the Constitution charges the State with the duty of preserving the shore, this Court finds that the access fee is not a tax upon a fundamental right. First, Plaintiffs do not have a fundamental right to use the beach property in question. Secondly, and alternatively, while plaintiff Cavanaugh may not cause any harm to the shore by his mere presence upon it, the Committee on the Executive Branch and independent agencies heard testimony from several individuals regarding the destruction and damage that were occurring to our coastal shores due to unrestricted public use and the costs involved in maintaining those areas and picking up after the public. This information, in conjunction with the inclusion of the language in the Constitution that the General Assembly shall take steps necessary to preserve and protect the beach, validates the fee which goes toward ameliorating the costs of preserving and maintaining the beach and the shore. Thirdly, the record does not establish that the beach access fee is a tax. Rather, the evidence indicates that the fee is just that, a user fee.
The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of Citizens of the United States; nor shall any State deprive any person of life liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The privileges and immunities protected by Section 1 of the Fourteenth Amendment are those privileges and immunities of national citizenship, including the rights of travel, to have access to the seat of government, to assemble, and to petition, and to have access to this nation's seaports through which all the operations of foreign trade and commerce are conducted. This right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it. Slaughter House Cases, 83 U.S. 36, 21 L.Ed 394 (1872) (citing Crandall v. State of Nevada, 73 U.S. 35, 18 L.Ed. 745, 6 Wall. 35 (1867)). The Plaintiffs allege that the beach access fee violates their constitutional rights to "free access to seaports." This claim, however, must fail by definition. The property in question is not a seaport; it is a recreational beach. A seaport is a port or harbor used for ocean ships, and that is not the use for which this stretch of sand is used.Compare seaport with seashore, Webster's New Universal Unabridged Dictionary, (2nd Ed. 1983) at 1636-1637.
Similarly, the Plaintiffs allege that the fee is an improper sea access toll. "The right to use watercourses as highways and the right to use highways on land, are said to be analogous, and to depend on the same general principle . . . Any and all of the public have an equal right to a reasonable use . . . In general, it may be stated that the rights of the public in navigable waters to all parts of such waters, or as it said in some cases, to the ordinary high-water mark." 78 Am. Jur.2d; Waters § 88 at 532-533; see also, Shively, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). Given this, the right does not extend to private lands and may be reasonably regulated by the police powers of the state. Id. Thus one cannot drive across a neighbor's property to reach the highway simply because to do so is a more direct route to where one is going. So, too, the Plaintiffs do not have a right to cut across the Town's property simply because it is a more direct route to the water than other available routes. Id.
Section 91 at 534-535 (noting that generally the public right of navigation does not include, as incident thereto, the right to go and come through the private land of another).
Similarly, the state has the right to exercise its police powers over the use of those waters so long as its actions are reasonable. Fees have been previously held as a valid exercise of such police powers so long as they are reasonable. 78 Am.Jur.2d Waters § 88 and McQuillin Mun Corp. § 24.207 (3rd Ed.).
Section 403 of 33 U.S.C. prohibits "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." As a result § 403 goes on to explain that it is not lawful "to build or commence the building of any wharf, pier, dolphin, boom weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable rivery, or other water of the United States . . . except upon plans recommended by the Chief of Engineers." Plaintiffs allege that the Narragansett Town Beach access fee operates as an "obstruction" as prohibited above, and therefore, the fee is illegal and void. While it is recognized that the Courts have interpreted the term obstruction broadly as to any obstacle which inhibits the navigability of the waters of the United States, this provision only extends as high as the mean high tide mark. United States v. Cameron, 466 F. Supp. 1099 (Fla. 1979); Pacific Coast Leslie Salt Co. v. Froehlke,578 F.2d 742 (9th Cir. 1978) (defining navigable waters of the United States as extending to the mean high water mark); United Statesv. Cannon 363 F. Supp. 1045 (Del. 1973) (finding that it is clear that the above provision does not reach activities on fast land). As previously discussed, there is insufficient evidence in the record to establish where the exact geographic tidal line extends, but it is undisputed that it at no point extends to Ocean Road, or the Beach facilities. As a result, the fee charged at that facility is an action taken on fast land and not upon the navigable water of the United States, and as such it does not fall within the prohibitions of 44 U.S.C. § 403. Alternatively, the record contains no evidence that the fee in any way interferes with the navigability of the Atlantic Ocean.
Lastly, Plaintiffs argue that the beach access fee violates Art. I, § 8 of the United States Constitution. Defendants deny this allegation and assert that the regulation is nondiscriminatory in that non-resident state visitors pay the same fee as nonresidents who live outside this state, and that the fees serve the legitimate purpose of maintaining and manning the beaches.
Article I, § 8, which is generally known as the Commerce Clause, provides that "[t]he congress shall have Power . . . to regulate commerce . . . among the several states." "In short the Commerce Clause, even without implementing legislation by Congress, is a limitation upon the power of the states" CampsNewfound/O'watonna Inc. v. Town of Harrison, 117 S.Ct. 1590 (1997). (Citations omitted) This provision prevents states from unjustifiably discriminating against or burdening the flow of commerce between the states. Oregon Waste Systems v. Dept. ofEnvironmental Quality, 511 U.S. 93, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13, 20 (1994). In order to serve the purpose of determining what regulations unjustifiably interfere with interstate commerce, the Court has developed a two-step test to determine whether a state action is proper. First, it must be determined whether the fact in question "regulates evenhandedly with only incidental effects upon commerce." Id. at 1350. This Court must ask itself whether the Town's beach access fee prescribes different treatment for in-state and out-of-state people. If it does, then to survive the statute which discriminates on its face against out-of-state commerce must advance a legitimate local purpose that could not be adequately served by reasonable nondiscriminatory measures. Camps Newfound,
117 S.Ct. at 1601. This strict scrutiny analysis is a very heavy burden to bear.
Alternatively, the state or governmental agency might prevail if its discriminatory actions were taken by the state in its role as a "market participant" as opposed to a market regulator. CampsNewfound, 117 S.Ct. at 1605. See also Lefrancois v. State ofRhode Island, 669 F. Supp. 1204, 1208 (D. R.I. 1987). A state acts as a market participant when it acts through a state-owned, and state-financed, entity or program. Reeves v. State,447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). When operating this way, a state may take measures designed at ensuring that the benefits of the state program are limited to those who fund the state treasury which fund the program. Id.
Secondly, if the action is nondiscriminatory and only has incidental effects on commerce, then the party challenging the action must show that the burden on commerce clearly outweighs the local benefits. Oregon Waste Systems, 114 S.Ct. at 1350.
In Camps Newfound the Supreme Court analogized a summer camp which advertised for and recruited campers from out-of-state and had a 95 percent out-of-state attendance rate with hotels and restaurants, Heart of Atlanta Motel v. United States,379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and held that such entities affect and may impede interstate commerce. 117 S.Ct. 1590 (1997). As a result the Court in Camps Newfound struck down, as violative of the Commerce Clause, a Maine state tax exemption which applied only to those camps serving primarily intrastate clientele. Camps Newfound, 117 S.Ct. at 1599.
The fee schedule in question does not discriminate against in-state and out-of-state citizens, and, as such, it is not discriminatory in a manner prohibited by the commerce clause. Additionally, Plaintiffs have not met their burden of establishing that the effect of the fee on interstate commerce clearly outweighs the legitimate purposes served by the fee as cited by the Town and supported by the budget information. While the Court is cognizant of the evidence presented by Plaintiffs that establishes that other beaches operate without access fees, this neither means that Narragansett's use of such fees is unreasonable nor does it tend to establish that the fees have an effect on commerce which outweigh the financial benefits of the fee.[5]
Since it is the ruling of this Court that there is no legal bar to the establishment of a beach access fee at the beach in question, the issue then becomes whether the Town properly established the fee in question.
The Narragansett Town Beach was authorized by P.L. 1939, Ch. 764 which, by its own express terms, authorized the Town of Narragansett to purchase the property now known as Narragansett Town Beach for the purposes of "carry[ing] on a general beach and bathhouse business . . . and to make reasonable rules and regulations for the use of the same, and charge suitable fees therefore." Not only did this act authorize fees to be charged so as to care for, improve, and maintain the beach for its use enjoyment, but it also allowed the Commission to operate the beach in such a manner that it would be liquid and "reasonably profitable to [the] [T]own its investment and the expenses of operation." P.L. 1939, Ch. 764, § 8. This act was valid at its inception, because the act did not provide regulation of the lands between the high and low tide marks. (Compare Jackvony v.Powell, 67 R.I. 218, [citing P.L. 1939, Ch. 759 as amended, as stating that "[e]xcept as otherwise directed by the representative council, said commission shall have control and charge of said beach, including the shores thereof between highand low water marks"] with P.L. 1939, Ch. 764, § 2 (providing that the boundaries for the authorized beach run in a "general southerly direction following the mean high water line of the Atlantic Ocean") or for regulation of other lands within Art. I, § 17 purview. Thus the act in no way violated Art. I, § 17. (Emphasis added.)
Public Law 1939, Ch. 764 did, however, provide that the Town was to carry out the beach operation "through the commission herein after created in section 6." P.L. 1939, Ch. 764, § 1. Section 6, in turn, provided that "The management . . . and the general conduct of the beach and bathhouse business of said town authorized by the aforegoing provisions, shall be vested in a beach commission consisting of three qualified electors of said town elected by the electors of said town qualified to vote upon a proposition for the imposition of a tax." P.L. 1939, Ch. 764, § 6. In 1966, however, with the adoption of the Narragansett Home Rule Charter, the Beach commission was replaced by the Department of Parks and Recreation. As a result, Plaintiffs allege that the transfer of the Beach Commission's power to the Department of Parks and Recreation was improper in that Public Laws 1939 was inconsistent with the Home Rule Charter and therefore the entire provision, not just the Beach Commission section, was invalidated. The Plaintiffs conclude that the Department of Parks and Recreation as it affects the Town beach violated the Home Rule Charter and provisions of the Rhode Island Constitution because the fee is a nonauthorized tax, and the tax was not authorized by the electorates of the Town.
The Town counters that the only provision of Public Laws 1938 that was repealed by the adopted Home Rule Charter was section 6, dealing with the beach commission, and that this provision was superseded by the Charter's provision authorizing the Department of Parks and Recreation to govern the beach. Additionally, the Town asserts that under the Home Rule Charter provisions of the Rhode Island Constitution, the beach is a local matter not needing state legislative authority or subject to the taxing provisions ratification.
While the Court is not satisfied that the beach is truly a local matter, particularly given the Constitutional Convention's concern with the need for the creation of additional statewide beach access, the Court need not reach the issue for two main reasons. First, the Court is satisfied that Employees RetirementSystem v. City of Providence, 660 A.2d 721 (R.I. 1995) stands for the proposition that home rule charters may supersede sections of preexisting legislative schemes without invalidating the entire preexisting authority. In the instant case, as with EmployeesRetirement, the Home Rule Charter merely replaced the Beach Commission with the Department of Parks and Recreation and, to that extent, P.L. 1939, § 6 was superseded by Charter §10-1-3 (b) which states that "the director (of the department of parks and regulation) shall . . . [b]e responsible for the maintenance and operation of public beaches." The other remaining sections of P.L. 1939, Ch. 764, however, which were not inconsistent with the chapter, were saved via Charter Sections1-3-2 and 1-3-3.
Secondly, the beach access fee is not a tax but rather a user fee, and therefore, it is permissible for the Town to institute such a fee even in the absence of General Assembly authority or local voter approval. Compare Black's Law Dictionary (6th Ed. 1991) at 1457 (defining a tax as a pecuniary burden laid upon individuals or property to support the government, and is a payment exacted by legislative authority; essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution) with Id. at 1543 (defining a user fee as charges imposed upon a person for a use of a particular facility; a charge designed only to make the user of state provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance and may be constitutionally imposed on interstate and domestic users alike).See also City of New Smyrna v. Board of Trustee, 543 So.2d 824
(Fla. 1989) (noting that the public trust doctrine does not prohibit municipalities from imposing reasonable user fees so long as the revenue generated is expended for the protection and maintenance of said beaches).
Plaintiffs had also previously alleged that Narragansett Town Ordinance 4-38 and Resolution 91-7 were void due to vagueness, but since this assertion was neither addressed in Plaintiffs' final memorandum or included in the stipulation of legal issues, the argument has been waived.
Lastly, Plaintiffs assert that the fee as structured violates Plaintiffs' equal protection rights. "When a state, or a political subdivision thereof, distinguishes between two similarly situated groups, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Such scrutiny is normally the rational basis variety unless the distinction involves a suspect classification or burdens a fundamental right." LCM Enterprises Inc., v. Town ofDartmouth, 14 F.3d 675, 679 (1st Cir. 1994). As discussed above, no fundamental right exists, and consequently, Plaintiffs can only benefit from the heightened scrutiny analyses if it can be established that the distinction drawn implicates a suspect class. Plaintiffs allege that the Town's fee does, in fact, implicate such classes because the fee discriminates on the basis of age, wealth, and Narragansett residency.
As illustrated above, the Town's fee scheme does discriminate based on age as, depending upon an individual's age, the person will be subject to a higher, a lower, or no fee. Age, however, is not a suspect classification and therefore this Court will only overturn the Town's actions if they are so unrelated to achieving legitimate objectives that they are irrational. Gregory v.Ashcraft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Similarly, wealth is not a suspect classification, nor is residency. City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I. 1995) and LCM Enterprises, 14 F.3d at 680 (1st Cir. 1994). Thus Plaintiffs bear and have not met the "difficult burden of showing that a government's financial planning, calculation and analysis is unreasonable to the point of irrationality." LCM Enterprises,
14 F.3d at 680 (1st Cir. 1994).
 Conclusion
Accordingly, judgment shall enter for the defendant Town. Counsel shall confer and agree upon an appropriate form of order and judgment reflective of this Court's decision and submit it to the Court forthwith for entry.
[1] The sole fee in dispute is the charge related to entering the Beach and not the other independent charges related to parking, locker, and bathhouse use.
[2] It is also worthy of note that the record, as it stands, contains no evidence of ownership of the wall, but rather merely includes facts tending to support the proposition that the State maintains the sidewalk along the street side of the wall. Stipulated Facts 22, 23 and 24.
[3] The Court has interpreted the term akibg to be an error and the intended word to have been "along" based on the context in which the word appears and a recognition of the fact that on a standard keyboard the "k" key is one key to the left of the "1" key, the "i" key is one key to the left of the "o" key and the "b" key is one key to the left of the "n" key.
[4] The plaintiffs argue that this language should not be considered by the Court because by doing so this Court would be impermissibly raising an affirmative defense sua sponte. This is not the case. Rather the Court is determining the meaning of Art. I, § 17 in its entirety and divining the meaning of "free" in its context as required by the tenets of statutory construction.
[5] While the term benefit is used, this term is somewhat misleading because the fee in effect merely serves to mitigate the Town's losses incurred in running the beach, and, in fact, the beach operates at a loss.